# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

               Plaintiff,

      v.                             Case No. 25-CR-1

OMAR BURKS,

               Defendant.

## ORDERS AND RECOMMENDATIONS

### 1. Procedural History

On January 14, 2025, a grand jury in this district returned a four-count indictment against Omar Burks, charging him with carjacking in violation of Title 18 U.S.C. Sections 2119(1) and 2(a), possessing a firearm as a convicted felon in violation of Title 18 U.S.C. Sections 922(g)(1) and 924(a)(8), possession with intent to deliver cocaine and fentanyl in violation of Title 21 U.S.C. Sections 841(a)(1) and 841(b)(1)(C), and possession of a firearm in furtherance of a drug trafficking offense in violation of Title 18 U.S.C. Section 924(c)(1)(A)(i). (ECF No. 1.)

Burks moved to suppress evidence derivative of his allegedly unlawful arrest (ECF Nos. 20, 21), to sever Count One from Counts Two through Four (ECF No. 18), and

to dismiss Count Two (ECF No. 19). The government filed a consolidated response (ECF No. 28) and an untimely supplemental response regarding Burks's request for a *Franks* hearing (ECF No. 31).[1] Burks replied. (ECF Nos. 36, 37, 38, 41.) The parties filed stipulated facts. (ECF No. 40.) The government filed an additional response regarding the issue of consent. (ECF No. 42.)

## 2. Facts

Unless otherwise noted, the following facts are taken from the parties' stipulated facts. (ECF No. 40.) The parties also stipulate to the exhibits filed with the motions, including the accuracy of photographs and surveillance video. (ECF No. 40, ¶ 1.)

### 2.1. The Carjacking

During the early hours of March 24, 2024, S.T. was a victim of a carjacking at the intersection of North 23rd Street and Wisconsin Avenue in Milwaukee, Wisconsin. (ECF No. 40, ¶¶ 4, 14.) Surveillance video shows that S.T. drove his Mazda north on North 23rd Street and stopped at the intersection of Wisconsin Avenue, where his car remained motionless with the left blinker flashing for over three minutes. (*Id.*, ¶ 14.) Meanwhile, a large dark blue SUV (described in Marquette University Police Officer Elizabeth Kranz's report as "possibly a Chevy Tahoe or Suburban") traveled east on West Michigan Street past the intersection of North 23rd Street and West Michigan

---

[1] The government sought leave to file its supplemental response to contest Burks's argument that the police did not have consent to search his house. (ECF No. 31.) After Burks filed his replies and the parties conferred and filed stipulated facts, the government filed an additional response stating it would not introduce evidence recovered during the search of the house, mooting the issue (ECF No. 42).

Street before apparently making a U-turn to return to the intersection, where it turned right onto North 23rd Street. (*Id.*, ¶ 16; Def. Ex. C at 19.12.)

The SUV stopped behind the Mazda for approximately 20 seconds before pulling alongside it. (ECF No. 40, ¶¶ 17-18.) The SUV then remained stationary. (*Id.*, ¶ 18.) Moments later, at approximately 1:48 AM, an unknown individual exited the driver's side of the SUV. (*Id.*, ¶ 19.) The SUV's brake lights illuminated and the SUV pulled forward, passing the Mazda and turning right onto Wisconsin Avenue. (*Id.*, ¶ 19.) Kranz's report described the SUV as having driven away "at a normal pace and not as if it were fleeing an area." (*Id.*, ¶ 19.) Meanwhile, the unknown individual opened a door on the passenger side of the Mazda and got in the car. (*Id.*, ¶ 20.)

The Mazda then drove across Wisconsin Avenue, from the 600 block onto the 700 block, and stopped just across the intersection. (ECF No. 40, ¶¶ 21-22.) The unknown individual got out of the passenger seat and walked around to the driver door, which the victim exited. (*Id.*, ¶ 22.) The victim walked around to the passenger side while the unknown individual drove away. (*Id.*, ¶ 22.)

Shortly thereafter, Marquette University Police Officers received a report of a crying man, unable to speak English, in distress about his car. (ECF No. 40, ¶ 4.) At 2:05 AM, three Marquette University Police Officers were dispatched to North 20th Street and Wisconsin Avenue to speak with the man, S.T. (ECF No. 40, ¶¶ 4-5.) They had

difficulty communicating with S.T. due to the language barrier. (*Id.*, ¶ 6.) Both officer Vincent Acevedo and Kranz noted in their reports that S.T. was intoxicated. (*Id.*, ¶ 8.)

At 2:31 AM, West Milwaukee police officer Carlos Perez, fluent in Spanish, arrived on scene to interview and interpret for S.T. (ECF No. 40, ¶ 9.) S.T. described to Perez that the suspect was "a black male about 40-50 years old, 6'0-6'2, muscular build, short black hair, gap in his teeth, black/brown beard, blue top, black pants, grey shoes, and carrying what [S.T.] described as a black pistol … in the front waistband of his pants." (*Id.*, ¶ 10.) S.T. described the carjacking as taking place in the 700 block of North 22nd Street (surveillance video shows the carjacking occurred at 23rd Street and Wisconsin). (*Id.*, ¶ 11.)

S.T. stated the suspect approached him on foot, asked him for money, and then pulled out the black pistol from his waistband and got inside S.T.'s Mazda. (ECF No. 40, ¶ 12.) He then demanded S.T.'s property and took S.T.'s iPhone 11 and wallet, containing $150 in cash, a BMO debit card, and immigration paperwork. (*Id.*, ¶ 12.) The suspect then forced S.T. out of the Mazda and took the car. (*Id.*, ¶ 12.) Due to the language barrier, S.T. was unable to say what exactly the suspect said to him while they were together. (*Id.*, ¶ 12.)

S.T. stated he would be able to identify the suspect if he saw him again. (ECF No. 40, ¶ 13.)

A few days later, on March 28, Milwaukee Police Department Officers Kranz, Kramer, and a bilingual officer, Contrares, had a follow-up interview with S.T. at his apartment. (ECF No. 40, ¶ 23.) Kranz noted in her report that S.T. described the robber's gun as a revolver, quoting him as saying, "A black gun where you put one bullet in and spins." (*Id.*, ¶ 24.) S.T. described the robber as a "black male" who was "big"/"built" and "looked like he goes to the gym." (*Id.*, ¶ 25.) S.T. again said he would recognize the robber if he saw him again. (*Id.*, ¶ 26.)

S.T. said he had been stopped at a red light behind another car (the surveillance video shows him idle at a stop sign) when the suspect got into his car and pointed the black revolver at him and stated, "give me all your money." (ECF No. 40, ¶¶ 14, 27.) S.T. stated that the man took his wallet, U.S. bank card, and iPhone before pointing the gun at him and telling him to get out of the car. (*Id.*, ¶ 27.)

### 2.2. A.H. Arrest and Interview

A week after the carjacking, in the early morning hours of April 1, 2024, Milwaukee police officers Seng Xiong and Kurt Kemnitz saw a 2010 Mazda with no license plates and a front bumper that appeared to have been spray painted black that they suspected was the stolen car. (ECF No. 40, ¶ 29.) When they attempted to stop the car, a high-speed chase ensued, totaling 7.78 miles and reaching speeds of 105 m.p.h. (*Id.*, ¶¶ 30-33.) The Mazda drove west on North Avenue, turned south onto Mayfair

Road, and was eventually stopped via stop sticks near South 108th Street and West Rogers Street. (*Id.*, ¶¶ 31-32.)

The Mazda's driver, A.H., was arrested. (ECF No. 40, ¶ 34.) The police determined the car was the Mazda stolen from S.T. (*Id.*, ¶ 36.) Xiong's report noted that, when A.H. was taken into custody, "he made a res gestae statement without being prompted that he purchased the vehicle from [a] 'hype' for $40." (*Id.*, ¶ 37.) At another point, A.H. said to the police, "I had rented that car from a hype, motherfucker, man. Joyriding. I'm sorry y'all. I was joyriding man." (*Id.* ¶ 37.)

When the police put A.H. in the transport van at the scene, he said, "I'm on probation. It's over for me, isn't it." (ECF No. 40, ¶ 38.) A moment later he said, "I know where some kilos of heroin are at, if you let me go," and a minute later exclaimed, "Damn, I'm gone!" (*Id.*)

That same day, detective Luke Wagner of the Marquette University Police Department ("MUPD") conducted a photo array targeting A.H. with S.T., assisted by an interpreter. (ECF No. 40, ¶ 40.) S.T. stated that none of the individuals he was shown were involved in the robbery. (*Id.*)

The next day, on April 2, MUPD Officer Quintin Harris conducted a *Mirandized* interview of A.H. (ECF No. 40, ¶ 41.) A.H. had at least eight prior felony convictions and was on extended supervision, facing revocation. (*Id.*, ¶ 72.) He reported to MUPD

that he suffered two brain injuries and was taking prescription medication for a brain aneurysm. (*Id.*)

For the first thirty-plus minutes of his interview A.H. accused an unknown person of giving him the stolen car and provided a detailed description of how it took place. (ECF No. 40, ¶ 42.) He described the person as a taller man with dreads who was with a woman, a "hype", who he didn't really know and was probably a prostitute. (*Id.*)

Harris interjected and informed A.H. that the car was stolen in an armed robbery, to which A.H. immediately asked whether there were cameras that captured the suspect. (ECF No. 40, ¶ 43.) Harris showed A.H. a surveillance still of the blue SUV that dropped off the robbery suspect, and A.H. said he thought he'd seen it before, perhaps around 32nd and Garfield. (*Id.*, ¶ 44.) A.H. asked again if there were any pictures of the suspect. (*Id.*, ¶ 47.)

Harris "clarif[ied]" that "all the other stuff [A.H.] told [him] at the beginning … was bullshit," to which A.H. responded, "erase all that shit, bro. Just tear that paper off. Start over." (ECF No. 40, ¶ 48.) A.H. first mentioned defendant Burks's name after more than 50 minutes into the interview. (*Id.*, ¶ 49.)

Harris wrote a report regarding his interview of A.H., which did not indicate that A.H. gave multiple stories about how he came into possession of the Mazda. (ECF No. 40, ¶ 50.) Harris's report summarizes what A.H. told him next as follows. (*Id.*, ¶ 51.) A.H. received a call from Burks on the morning of March 31 stating he had powder and

was trying to "pop off," referring to drugs. (*Id.*) A.H., who said he snorts cocaine from time to time, had his girlfriend drive him to Burks's house and park in the alley because Burks did not want people to know where he lived. (*Id.*) At Burks's house, A.H. asked for money. (*Id.*) Burks said he did not have money, but he had a Mazda that he stole from a sleeping person stopped near the Rave (2401 West Wisconsin) about a week before. (*Id.*) A.H. bought the car for $100. (*Id.*) Burks drove A.H. down the street to the Mazda and A.H. drove back to the alley where his girlfriend was, and then went joyriding until he was arrested. (*Id.*)

A.H. reported that he knew Burks because they formerly lived in the same apartment building at 2344 West Michigan, and that before getting the Mazda he had not seen Burks for about a month to a month and a half. (ECF No. 40, ¶ 52.) He described Burks as a black male with a muscular build, dreads past his shoulders, a mustache, and in his late thirties. (*Id.*, ¶ 52.)

A.H. described Burks as having a Facebook page named something like "Get it by all means," and he confirmed that Harris located the correct Facebook page and identified Burks. (ECF No. 40, ¶ 53.) A.H. identified the blue SUV in the surveillance still as Burks's Tahoe. (*Id.*) He provided Burks's phone number and said Burks lived near West Burleigh Street and North Teutonia Avenue, and that Burks kept a micro-Draco in his house as well as an A.R. style rifle. (*Id.*) A.H. mentioned fearing Burks and claimed he was connected to "GDs", "Gangsta Disciples" out of Chicago. (*Id.*, ¶ 56.)

A.H. did not mention a revolver, and he refused to identify his girlfriend, whom he said he did not want involved and did not have any knowledge of the Mazda (even though he stated she was there when he got it). (ECF No. 40, ¶ 54.) At several points during the interview, A.H. expressed worry that his supervision would be revoked and his desire that the District Attorney be made aware of his cooperation. (*Id.*, ¶ 55.)

Harris stopped the interview and used law enforcement databases to determine that Burks lived on 16th Street, near the intersection of West Burleigh Street and North Teutonia Avenue, owned a blue 2003 Chevy Tahoe SUV with license plate TH9458, and resided with a girlfriend who owned a maroon Chevy Tahoe. (ECF No. 40, ¶ 57.) Harris obtained photos of Burks's house and returned to continue interviewing A.H. (*Id.*, ¶¶ 57-58.)

In A.H.'s follow-up interview, he identified photos of Burks and his house. (ECF No. 40, ¶ 58.) He also stated that Burks sold cocaine, carried a gun on his person or in his SUV, and had a secret compartment in the center console of his Tahoe where he hid his drugs and guns. (*Id.*, ¶ 59.)

### 2.3. Arrest of Burks and Subsequent Searches

On April 5, at 2:15 PM, Harris conducted surveillance near Burks's house. (ECF No. 40, ¶ 60.) After about 45 minutes, Harris observed Burks arrive at the house in a blue Tahoe with license plate TH9458. (*Id.*, ¶ 61.)

Harris called for backup. (ECF No. 40, ¶ 61.) Burks parked the Tahoe on the side of the street and entered the house. (*Id.*, ¶ 62.) About 10 minutes later, Burks returned to the SUV and re-entered the driver's door. (*Id.*, ¶ 63.) MUPD officers approached Burks's car, activated their emergency lights, ordered Burks out of the car and arrested him. (*Id.*, ¶¶ 64-65.) Burks was cooperative upon arrest. (*Id.*, ¶ 68.)

Burks had shoulder length dreadlocks and had no gap notable in his teeth. (ECF No. 40, ¶ 66.) Police records describe Burks as 6′5″ tall and 34 years old. (*Id.*, ¶ 67.) At the time of Burks's arrest, MUPD had not conducted a photo array for S.T. that included Burks. (ECF No. 40, ¶ 73.)

Officers seized from Burks's person two cell phones and an Apple watch. (ECF No. 40, ¶ 69.)

The following images show two still shots taken from surveillance video of the SUV used in the robbery, compared with two photographs taken by an MUPD officer of Burks's Tahoe after his arrest:



Carjacking Video Screenshot: Passenger's side.



Burks' Tahoe 4/5/24: Passenger's side.



Carjacking Video Screenshot: Driver's side.



Burks' Tahoe 4/5/24: Driver's side.

(ECF No. 40, ¶ 71.)

After Burks was placed in handcuffs and taken from the scene, MUPD officer

Adam Schein took photos of and searched the Tahoe. (ECF No. 40, ¶¶ 76-77.) He found

a fully loaded black Smith and Wesson "Governor" .45 caliber revolver under the

driver's seat. (*Id.*, ¶ 77.) The center console had an unsecure cup-holder, underneath which was a storage space containing a small scale, a bag of a white substance, and five corner cuts of a brown substance. (*Id.*, ¶ 79.) The white and brown substances field-tested positive for cocaine and fentanyl, respectively. (*Id.*, ¶ 85.) The back of the Tahoe contained a backpack with additional clear plastic bags and a variety of other ammunition. (*Id.*, ¶ 80.)

Schein reported that he "took overall photographs of the vehicle prior to searching" and "photographed and collected" items from the Tahoe as evidence. (ECF No. 40, ¶ 81.) He completed a "receipt for property" form, listing the backpack, Apple Watch, Apple iPhone, Android phone, paystub, Draco AK47, and revolver. (*Id.*, ¶ 83.)

MUPD officers also entered Burks's home and spoke with his girlfriend. (ECF No. 40, ¶ 87.) The parties dispute whether the officers had valid consent to enter the home. (*Id.*, ¶¶ 99-103.) Inside the home, officers observed a .22 caliber rifle against the upstairs window and a Micro Draco in the bedroom and seized the Draco. (*Id.*, ¶¶ 90, 92.) The government has agreed not to introduce evidence recovered during the search of Burks's house, mooting the issue of consent. (ECF No. 42 at 1.)

### 2.4. Search Warrants

Harris prepared affidavits in support of search warrants for Burks's phones and phone records. (ECF No. 40, ¶ 95; ECF No. 28 at 10.) On December 9, 2024, MUPD

Officer Schein received a flash drive containing data extracted from Burks's iPhone, including the entire contents of his phone. (ECF No. 40, ¶ 96.)

In reviewing the data extracted from Burks's iPhone, law enforcement identified biometric data from Burks's AppleWatch. (ECF No. 40, ¶ 97.) MUPD asked the Wisconsin Department of Justice Criminal Investigation ("DCI") to interpret the data from Burks's AppleWatch, and DCI Senior Digital Forensic Examiner Jason Ruff wrote a report summarizing his opinion that the AppleWatch data shows movement around the time of the carjacking. (*Id.*, ¶ 98.)

The government indicates that other evidence obtained from the search warrants includes a photo of S.T.'s Vehicle Registration and title and a photo of S.T.'s ID card, taken on March 24, 2024 (the day of the carjacking). (ECF No. 28 at 10.) There was also a photo of S.T.'s Mazda, taken on March 28, 2024, and photos of firearms. (*Id.*) Cell phone records obtained for Burks's phone indicate it was roughly in the area of the carjacking around the time of the incident, and records for S.T.'s phone indicate it was in the area of Burks's house following the carjacking. (*Id.* at 11-12.)

### 3. Analysis

#### 3.1. Arrest of Burks

"An arrest is lawful under the Fourth Amendment so long as it is made based on probable cause." *United States v. Hill*, 818 F.3d 289, 294 (7th Cir. 2016). "Officers have probable cause to arrest when the facts and circumstances known to them 'reasonably

support a belief that the individual has committed, is committing, or is about to commit a crime.'" *United States v. Davis*, 119 F.4th 500, 505 (7th Cir. 2024) (quoting *Doe v. Gray*, 75 F.4th 710, 718 (7th Cir. 2023)). "Whether probable cause exists is a 'commonsense, practical question' made considering the totality of the circumstances." *Hill*, 818 F.3d at 294 (quoting *Illinois v. Gates*, 462 U.S. 213, 230-31 (1983)). A court reviewing a probable cause determination weighs the evidence "as understood by those versed in the field of law enforcement." *Hill*, 818 F.3d at 294 (quoting *Gates*, 462 U.S. at 232).

"The principal components of a determination of ... probable cause will be the events which occurred leading up to the [arrest], and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to ... probable cause." *Ornelas v. United States*, 517 U.S. 690, 696 (1996). This means that, under the totality of the circumstances, officers must "reasonably believe that a particular individual has committed a crime." *United States v. Navarro*, 90 F.3d 1245, 1254 (7th Cir. 1996) (quoting *United States v. Gilbert*, 45 F.3d 1163, 1166 (7th Cir. 1995)). Although more than mere suspicion is required, probable cause does not require virtual certainty. *Gilbert*, 45 F.3d at 1166 (citing *Gates*, 462 U.S. at 295 (1983)) ("[P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity."). To sustain a warrantless arrest, the government need only establish probable cause that the defendant committed a crime; it need not have probable cause for every crime suspected or probable cause for any specific crime.

Burks argues that the officers lacked probable cause to arrest him for committing a crime, and thus to search him incident to arrest. (ECF No. 21 at 16.) He highlights the unreliability of A.H.—who was arrested for driving the stolen Mazda, self-interested in shifting blame off himself, has a history of felonies and was facing revocation of his supervision, had no track record of reliability as an informant, and told contradictory stories to the police about the Mazda. (ECF No. 21 at 17-18, 21-23.) Accordingly, Burks argues that A.H.'s information about him was not reliable enough to create probable cause to arrest him. (*Id.*) Especially considering that Burks did not match S.T.'s description of the robber, Burks argues that the officers were required to further investigate the veracity of A.H.'s statements. (*Id.* at 18, 22-23.) Furthermore, Burks argues that, even if the SUV used in the carjacking was his Tahoe, someone else could have been driving, and that the driver was not necessarily involved in the carjacking. (*Id.* at 19.)

The government responds that the officers had probable cause to arrest Burks based on the following facts: A.H. was arrested driving S.T.'s car, A.H. indicated that Burks owned the SUV used in the carjacking, and Burks owned a 2003 Blue Chevy Tahoe with black rims and a dealer pinstripe identical to the vehicle used in the carjacking. (ECF No. 28 at 13-14.) As to A.H.'s credibility, the government states that it is a common occurrence where a "criminal first lies[,] blaming an unknown and unspecified individual, but then later gives a more specific and more credible account of

events implicating himself and others." (*Id.* at 13.) And A.H.'s latter statement accurately stated when, where, and how the Mazda was taken, and the officers corroborated the information A.H. provided about Burks. (*Id.* at 14.)

The government does not contend that it had probable cause to arrest Burks for the drugs or guns crimes. (Nor could it have; the only evidence of these crimes were then-uncorroborated statements by A.H.)

Burks's reply again focuses on the differences in his appearance from S.T.'s description of the robber. (ECF No. 41 at 1-9.) Burks provides the following photos to illustrate the differences in his appearance from S.T.'s description of the robber:



(ECF No. 41 at 2.)

When the officers arrested Burks they knew that he owned a 2003 Blue Chevy Tahoe with black rims, consistent with the one used in the carjacking two weeks earlier. (ECF No. 40, ¶¶ 60, 70.) They knew that A.H. had been arrested four days before,

driving the stolen Mazda, and identified Burks as the owner of the Tahoe and as having been involved in the carjacking. (*Id.*, ¶¶ 29-36, 53.) These facts support the commonsense inference and reasonable belief that Burks was involved in the carjacking (a crime involving multiple people), giving the officers probable cause to arrest Burks for carjacking.

A.H.'s credibility issues do not negate probable cause because the officers corroborated much of what A.H. told them. Most importantly, A.H. accurately led the officers to the Tahoe entirely consistent with the one used in the carjacking. He also provided the officers with information which verified his familiarity with the carjacking (Burks told the officers he stole the Mazda from a sleeping person stopped near the Rave, which is near where the carjacking took place). (ECF No. 40, ¶ 51.) And the officers were able to verify the information A.H. provided about Burks—he drives a Tahoe, his physical description, he has a Facebook page named something like "Get it by all means," he resided near West Burleigh Street and North Teutonia Avenue. (*Id.*, ¶¶ 57-58.) These details about Burks corroborated A.H.'s identification of Burks's involvement in the carjacking.

The fact that Burks does not exactly match S.T.'s description of the robber also does not negate probable cause. The carjacking involved at least two people: the person who entered the Mazda and the person driving the SUV. The Court gives no weight to Burks's argument that the SUV was not involved in the carjacking—the SUV did a U-

turn, slowly pulled up by the idling Mazda, stopped directly next to it and let an unknown individual out of the SUV, who then entered the Mazda and drove away. (ECF No. 40, ¶¶ 16-19.) *See Gilbert*, 45 F.3d at 1166 (probable cause does not require virtual certainty).

With the carjacking most likely involving at least two people, Burks could have been involved but not have been the person seen by S.T. Even if Burks had been the person S.T. saw, S.T.'s description of the person he saw does not overcome the reasonable inference that Burks was involved—S.T. was drunk when he initially identified the car thief as having short hair, aged 40-50 years old, with a gap in teeth.

Burks also argues there is no evidence that he drove the SUV away from the scene and the theory that he did is inconsistent with A.H.'s telling of the events. (ECF No. 41 at 3.) The theory that Burks drove the SUV from the scene is not "after-the-fact conjecture," as he suggests. Rather, it is an acknowledgment of one scenario of how Burks could have been involved in a crime involving multiple people in a vehicle consistent with the one he owns. The officers need not believe every detail of A.H.'s story to have reason to believe that parts of it are true.

Burks also argues that, even if the officers knew Burks's Tahoe was the one used in the carjacking, "the police needed to have evidence showing Burks's presence and active participation in the robbery[.]" (ECF No. 41 at 4.) In support, Burks cites cases from New York. (*Id.* (citing *People v. Holley*, 188 A.D.3d 1644, 1645-66 (N.Y. App. Div.

2020), *People v. Dawkins*, 163 A.D.2d 322, 323-25 (N.Y. App. Div. 1990)), and *People v. Fleming*, 842 N.Y.S.2d 195, 200 (N.Y. Sup. Ct. 2007).) But there is no hard and fast rule about what evidence police need to satisfy the fact-intensive probable cause test. Burks's possession of the Tahoe is strong evidence of his involvement in the carjacking, bolstered by the other circumstances already discussed. Additional evidence of his "presence and active participation" was not required.

Burks argues that the officers were required to further investigate the carjacking before arresting him. (ECF No. 21 at 25.) He highlights what police could have done to further investigate the crime, without establishing whether they *should* have done more under the law. "[A]n arresting officer must seek out only information that 'could have been easily obtained and was necessary' to conclude a crime had been committed." *Jump v. Vill. of Shorewood*, 42 F.4th 782, 791 (7th Cir. 2022) (discussing *BeVier v. Hucal*, 806 F.2d 123, 128 (7th Cir. 1986)). "That is not a free-standing affirmative duty for officers to pursue all avenues of investigation before arrest." *Id.* "Rather, it follows the 'well-settled' rule that 'once detectives have performed a good-faith investigation and assembled sufficient information from the totality of the circumstances to establish probable cause, they are not required under the Constitution to continue searching for additional evidence.'" *Id.* (quoting *Driebel v. City of Milwaukee*, 298 F.3d 622, 643-44 (7th Cir. 2002)). Because the officers already investigated the crime sufficient to establish

probable cause to believe Burks was involved in the carjacking, they had no duty to investigate further before arresting him.

Having probable cause to arrest Burks, the officers' search of Burks incident to arrest was also proper. Therefore, the Court will recommend that the motion to suppress all evidence derivative of Burks's arrest, including the search incident to arrest, be denied.

### 3.2. Search of the Tahoe

Burks argues that, even if there was probable cause to arrest him, the officers did not have grounds to perform a warrantless search of his Tahoe. (ECF No. 21 at 26; ECF No. 41 at 10-14.)

The government argues that its search of the Tahoe was a valid inventory search, was justified under both the search incident to arrest and automobile exceptions to the warrant requirement, and that suppression is also inappropriate under the inevitable discovery doctrine. (ECF No. 28 at 15-21.)

The government does little to support its contention that the search was an inventory search. As Burks points out, the officers' reports characterize the search as a search incident to arrest. (ECF No. 41 at 13; Def. Ex. CC ("[Schein] was instructed to search the vehicle ... for a revolver handgun that was used in the armed robbery and any wallet contents or cellphone that would have belonged to the victim."); Def. Ex. K "SCHEIN conducted a search incident to arrest of the vehicle.").) The receipt for

property form Schein filled out did not, as the government contends, note "all property of value" in accordance with department inventory policy (ECF No. 28 at 19); rather it listed only the evidence the officers seized (backpack, Apple watch, Apple iPhone, Android phone, Pay stub, Draco AK 47, Smith and Wesson Revolver) (ECF No. 28-2; ECF No. 41 at 14), and none of the other items of value in the car, including a speaker, jumper cables, and socket sets (*see* ECF Nos. 40-1, 40-2). Accordingly, Schein circled "evidence" to describe the items listed on the form. (ECF No. 28-2.)

The officers' search is more accurately described as a search incident to arrest. Both the search incident to arrest exception and automobile exception to the warrant requirement are applicable.

As the Seventh Circuit noted in *United States v. Davis*, "[t]hese exceptions 'are interrelated, but not identical.'" 119 F.4th at 506 (quoting *United States v. Edwards*, 769 F.3d 509, 514 (7th Cir. 2014)). A search of a car incident to arrest may occur "when it is 'reasonable to believe' the car contains evidence of the offense of arrest." *Id.* (quoting *United States v. Reedy*, 989 F.3d 548, 555 (7th Cir. 2021)). The automobile exception "is not tied to an arrest. It 'permits an officer to search a vehicle without a warrant if the search is supported by probable cause,' regardless of any arrest." *Id.* (citation omitted) (quoting *United States v. Ochoa-Lopez*, 31 F.4th 1024, 1026 (7th Cir. 2022)).

The circumstances of A.H.'s arrest, his statements, and the officers' corroboration of Burks's identity and ownership of the Tahoe established probable cause to believe

Burks's Tahoe would contain evidence of the carjacking. *See Edwards*, 769 F.3d at 515 (finding that a stolen car supported not just "reason to believe," but probable cause that the car would contain evidence of a crime because evidence of a vehicle's ownership is relevant to the crime of driving a vehicle without an owner's consent). In particular, the officers had probable cause to search the SUV for the gun used in the carjacking, the Tahoe's title and other identifiers for Burks, and S.T.'s stolen property.

Thus, the search of Burks's Tahoe was lawful, falling within both the search incident to arrest and automobile exceptions to the warrant requirement. Finding such, the Court does not reach the government's inevitable discovery arguments.

The Court will recommend that Burks's motion to suppress evidence based on a warrantless search of the Tahoe be denied.

### 3.3. Search Warrants (Phones and Phone Records)

Burks argues for suppression of all evidence and derivative evidence obtained from the search warrants for two cell phones seized when police arrested him and for T-Mobile records. (ECF No. 20 at 1.) He argues that the warrant affidavits failed to establish probable cause and were overly broad, the officers' search exceeded the scope of the warrants, and the affiant intentionally and/or recklessly omitted material information from the affidavit that would have eliminated any probable cause. (*Id.* at 1-2.)

### 3.3.1. Probable Cause

"An affidavit submitted in support of a warrant application 'need only contain facts that, given the nature of the evidence sought and the crime alleged, allow for a reasonable inference that there is a fair probability that evidence will be found in a particular place.'" *United States v. Vizcarra-Millan*, 15 F.4th 473, 501 (7th Cir. 2021) (quoting *United States v. Aljabari*, 626 F.3d 940, 944 (7th Cir. 2010)). "Probable cause is a common-sense standard," and a reviewing court gives "deference to an issuing judge's assessment." *Id.*

An issuing judicial officer "may draw reasonable inferences about where evidence is likely to be found based on the nature of the evidence and the offense." *United States v. Zamudio*, 909 F.3d 172, 175 (7th Cir. 2018). Thus, "for a search warrant, probable cause' does not require direct evidence linking a crime to a particular place.'" *Id.* (quoting *United States v. Anderson*, 450 F.3d 294, 303 (7th Cir. 2006)).

In addition to the factual bases for believing that Burks was involved in the carjacking that supported his arrest, the officers found additional evidence of crimes during their search of Burks's Tahoe: a black revolver, fentanyl, cocaine, and a scale. (ECF No. 40, ¶¶ 77-85.) Having reason to believe Burks was involved in the carjacking and dealing drugs, the officers were permitted to follow their training and experience regarding the habits and practices of persons engaged in such crimes, including searching the phones found on Burks's person.

While cellphones are subject to the Fourth Amendment's warrant requirement, they are not "subject to any sort of enhanced warrant requirement." *United States v. Robinson*, No. 23-CR-212, 2024 U.S. Dist. LEXIS 77296, at *4 (E.D. Wis. Apr. 29, 2024) (discussing *Riley v. California*, 573 U.S. 373, 401 (2014), and citing *Vizcarra-Millan*, 15 F.4th at 504). For drug dealing alone, searches of cell phones are recognized as valid because "[c]ellular phones are ubiquitous in life, … when a person's life involves drug dealing, evidence of that criminal activity is likely to be found on a person's cellular phone." *United States v. Stewart*, No. 20-CR-56, 2020 U.S. Dist. LEXIS 197364, at *16 (E.D. Wis. May 13, 2020); *see also Robinson*, 2024 U.S. Dist. LEXIS 77296, at *5. Courts routinely uphold the search and seizure of cell phones, seized pursuant to a warrant, that are tied to the offense or the alleged perpetrator of the offense. *See In re Search Warrant Application for the Search of a Townhome Unit*, No. 20-MC-106, 2020 U.S. Dist. LEXIS 68652, at *3-19 (N.D. Ill. Apr. 20, 2020) (discussing caselaw on searching electronic devices).

As to phone records, Burks makes no specific argument as to how the affidavit failed to establish probable cause for the search. Already having probable cause to believe Burks was involved in the carjacking, and having found two cell phones on his person, the officers had probable cause to believe evidence of the carjacking would be found in the phone records, including evidence of who owned the phones and where and when they were used during the period in question. (*See* ECF No. 20-3.)

Reading the affidavits as a whole, in a common sense, non-technical manner, *see Aljabari*, 626 F.3d at 944, and especially giving "'great deference' to the issuing judge[s'] finding of probable cause," *United States v. Fifer*, 863 F.3d 759, 764 (7th Cir. 2017) (quoting *United States v. Dessart*, 823 F.3d 395, 400 (7th Cir. 2016)), a substantial basis existed for concluding there was probable cause that evidence of a crime would be found in the cell phones and T-Mobile records. *Gates*, 462 U.S. at 238.

### 3.3.2. Particularity and Scope

Burks argues that the warrants to search the cell phones and T-Mobile records lacked particularity and were overbroad because they allowed the police to search the entirety of the cell phones and to search two months' worth of phone records. (ECF No. 20 at 8-10.)

The Fourth Amendment "categorically prohibits" the issuance of a warrant that does not describe with particularity the objects to be seized. *Maryland v. Garrison*, 480 U.S. 79, 84 (1987). "As to what is to be taken, nothing is to be left to the discretion of the officer executing the warrant." *United States v. Jones*, 54 F.3d 1285, 1290 (7th Cir. 1995) (quoting *Marron v. United States*, 275 U.S. 192, 196 (1927)). "In practice, courts have therefore demanded that the executing officers be able to identify the things to be seized with reasonable certainty and that the warrant description must be as particular as circumstances permit." *Id.* (quoting *United States v. Brown*, 832 F.2d 991, 996 (7th Cir. 1987)). A court determines whether a warrant meets the particularity requirement by

evaluating whether "an executing officer reading the description in the warrant would reasonably know what items are to be seized." *United States v. Hall*, 142 F.3d 988, 996 (7th Cir. 1998). However, "[i]f detailed particularity is impossible, generic language is permissible if it particularizes the types of items to be seized." *Id.*

A warrant authorizing the search of a phone "is not necessarily rendered 'too general' merely because it authorizes law enforcement 'to look at every file on [a seized] phone.'" *United States v. Robinson*, No. 23-CR-212, 2024 U.S. Dist. LEXIS 100647, at *14 (E.D. Wis. June 6, 2024) (alteration in original) (quoting *United States v. Bishop*, 910 F.3d 335, 336 (7th Cir. 2018)). The particularity requirement as to electronic devices is satisfied "if the warrant cabins the things being looked for by stating what crime is under investigation." *Bishop*, 910 F.3d at 337.

The warrants to search the cell phones satisfied the particularity requirement by cabining the search to the crimes under investigation: armed robbery, felon in possession of a firearm, and possession with intent to distribute Fentanyl and Cocaine. (ECF Nos. 20-1, 20-2.)

The officers did not exceed the scope of the warrant by viewing the iPhone health application data. (*See* ECF No. 20 at 10.) As the government explains, this data was alongside other data on the phone that, when downloaded, appeared in plain view with the rest of the cell phone data. (ECF No. 28 at 28-29.) It was thus covered by the search warrant authorizing a search of the phone.

The warrant to search the cell phone records were limited to Burks's phone number, evidence of the suspected crimes, and content made between February 1, 2024, and April 10, 2024. (ECF N. 20-3.) While Burks argues that the timeframe should not have exceeded the time pertaining to the armed robbery (March 24 to April 5), the warrants were also for evidence of Burks being a felon in possession of a firearm and drug trafficking, crimes which are ongoing in nature. Accordingly, the warrant and its two-month time frame was not overbroad.

### 3.3.3. Omissions

Burks contends that, in the affidavits for search warrants to search the cell phones and T-Mobile records, the affiant, Harris, concealed facts that undermined A.H.'s credibility and provided an incomplete account of S.T.'s description of the suspect. (ECF No. 20 at 11.) Burks argues that "the only possible explanation for the warrant's omissions … [was] to mislead the magistrate." (*Id.*)

If an affidavit submitted to support a search warrant contains intentionally false or misleading statements, suppression of any evidence seized pursuant to that warrant may be appropriate. *See Franks v. Delaware*, 438 U.S. 154, 155-56 (1978). Commonly referred to as a *Franks* motion, suppression on this basis requires a two-phase process. In the first phase the defendant must "make a substantial preliminary showing that: (1) the warrant affidavit contained false statements, (2) these false statements were made intentionally or with reckless disregard for the truth, and (3) the false statements were

material to the finding of probable cause." *United States v. Mullins*, 803 F.3d 858, 861-62 (7th Cir. 2015) (citing *United States v. Williams*, 718 F.3d 644, 647 (7th Cir. 2013)). False statements in the context of a *Franks* motion could also include omissions, not just affirmative misrepresentations. *Id.* at 862. Only if the defendant satisfies all steps in this first phase will the motion proceed to the second phase—an evidentiary hearing, commonly referred to as a *Franks* hearing. At a *Franks* hearing the defendant must show by a preponderance of the evidence "that the false statements or omissions were made intentionally or with reckless disregard for the truth, and without the false material the affidavit's remaining content is insufficient to establish probable cause." *Id.*

"The role of a judge considering a defendant's motion for a *Franks* hearing is to remove any overt falsehood from the affidavit—or else incorporate any omitted material facts that undermine probable cause, if an omission is what rendered the affidavit misleading—and see if probable cause remains." *United States v. Daniels*, 906 F.3d 673, 676 (7th Cir. 2018).

Alleged omissions regarding an informant's credibility may not be material when the tips are sufficiently corroborated. *United States v. Clark*, 935 F.3d 558, 565 (7th Cir. 2019) (discussing cases, including *United States v. Hancock*, 844 F.3d 702, 710 (7th Cir. 2016), in which a Franks hearing was not required despite the omission of "information about the informant's own criminal history" because the informant provided "fresh, detailed information about a suspect's drug sales"). A case with only weak

corroboration is more likely to warrant a *Franks* hearing where the affiant includes *no* adverse information about the informant. *See id.* at 565-66 (discussing cases and finding a *Franks* hearing was required where the corroboration was that a man claimed only that his passenger met with "Big Mike" outside his presence to buy heroin and a "mom on a mission" had an unsupported suspicion about a man in Room 203, and the affidavit "did not include *any* of the substantial adverse information … about the informant's credibility" (emphasis in original)).

Here, the officers substantially corroborated A.H.'s information, including the key points that Burks owned a Chevy Tahoe consistent with the one used in the carjacking, his identity, and where he lived. (ECF No. 40, ¶¶ 53, 57.) Furthermore, the affiant did not leave out all adverse information about A.H.; he included arguably the most material and damaging fact—that A.H. was arrested driving the stolen Mazda. (ECF No. 20-1 at 3; ECF No. 20-2 at 4.) Given the officers' substantial corroboration of A.H.'s information, the inclusion of this fact regarding A.H.'s credibility was enough. Furthermore, there is no suggestion that omitting further detail was in disregard for the truth, rather than for the purpose of brevity; the affiant omitted details pertaining to A.H.'s felony history, his arrest, and his inconsistent stories, *as well as* details regarding his corroborated information that would have *bolstered* his credibility (i.e., his knowledge of a hidden compartment under the center console of Burks's Tahoe where Burks hid drugs). (ECF No. 40, ¶¶ 59, 79.) Burks failed to make a showing that the

alleged omissions regarding A.H.'s credibility were material or made with intentional or reckless disregard for the truth.

The alleged omission regarding S.T.'s description of the carjacker relates to characteristics S.T. mentioned only during his initial interview, when he was drunk. (ECF No. 40, ¶¶ 8, 10.) The description the affiant included, on the other hand, is entirely consistent with the description S.T. gave at the follow-up interview, when he was sober. (*Id.*, ¶ 25.) Thus, Burks fails to make a substantial preliminary showing that the affiant omitted these details in disregard for the truth.

Even if the affiant had intentionally or recklessly omitted information, the alleged omissions relate only to probable cause to search based on the *carjacking*. The cell phone and T-Mobile search warrants were also supported by probable cause to search for the crimes of drug trafficking and felon in possession based on the officers' recovery of a revolver and drugs in Burks's Tahoe. (ECF No. 40, ¶¶ 77-85.) Burks cannot show that the alleged omissions were material.

Accordingly, Burks's motion for a *Franks* hearing will be denied. The Court does not reach the government's good faith exception argument. The Court will recommend the motion to suppress evidence derivative of the search warrants be denied.

### 3.4. Motion to Sever (ECF No. 18)

#### 3.4.1. Joinder

Federal Rule of Criminal Procedure 8(a) states that two or more offenses may be charged in a single indictment "if the offenses charged… are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Courts "construe Rule 8 broadly to allow joinder to enhance" judicial efficiency "and to avoid expensive and duplicative trials[.]" *United States v. Archer*, 843 F.2d 1019, 1021 (7th Cir. 1988) (citation omitted); *United States v. Berg*, 714 F.3d 490, 494 (7th Cir. 2013).

Accordingly, the Seventh Circuit "has adopted an expansive interpretation of what constitutes a 'transaction' under Rule 8(a): 'transaction' is 'a word of flexible meaning and 'may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship.'" *United States v. Woody*, 55 F.3d 1257, 1267 (7th Cir. 1995) (quoting *United States v. Berardi*, 675 F.2d 894, 899 (7th Cir. 1982)). "In determining whether the connection between the acts charged is sufficient to meet the requirements of joinder under Rule 8(a), the court should be guided by the extent of evidentiary overlap." *Berardi*, 675 F.2d at 899-900 (citing *United States v. Raineri*, 670 F.2d 702 (7th Cir. 1982), *United States v. Zouras*, 497 F.2d 1115, 1122 (7th Cir. 1974), and *United States v. Pacente*, 503 F.2d 543 (7th Cir.) (en banc), *cert. denied*, 419 U.S. 1048 (1974)); *Woody*, 55 F.3d at 1267.

In *United States v. Pacente*, the Seventh Circuit, en banc, found that the counts were based on the same act or transaction because they "require[d] substantially the same proof." 503 F.2d at 545; *see also United States v. Isaacs*, 493 F.2d 1124, 1159 (1974) (per curiam) (finding that evidentiary overlap pertinent to proof warranted joinder), *overruled on other grounds by United States v. Gimbel*, 830 F.2d 621 (7th Cir. 1987); *United States v. Koen*, 982 F.2d 1101, 1111-12 (1992) (finding the embezzlement count was logically related to the arson and mail fraud counts because each related to the defendant's mishandling of funds).

Burks is charged in Count One with an armed robbery—a charge that includes the use of a firearm. (ECF No. 40, ¶ 10.) Count Two charges Burks with being a felon in possession of a firearm, and one of the guns he is charged with possessing (ECF No. 1 at 2) is the same gun the government alleges was used in the carjacking (ECF No. 40, ¶ 77; ECF No. 28 at 35.). This is enough to join the two counts. *See United States v. Carter*, 695 F.3d 690, 700 (7th Cir, 2012) (carjacking and felon in possession were properly joined because they involved the same gun).

Burks does not dispute that Count Two is properly joined with Counts Three (possession with intent to distribute) and Four (possessing a firearm in furtherance of drug trafficking)—all of which are related drug and gun offenses properly joined. *See United States v. Stokes*, 211 F.3d 1039, 1042 (7th Cir. 2000). It is immaterial that Count One

does not relate to Count Three; nothing suggests that such chaining of charges is improper.

### 3.4.2. Prejudice

Even when joinder is proper under Rule 8, a court has the discretion to order separate trials when "joining offenses … for trial appears to prejudice a defendant." Fed. R. Crim. P. 14(a). The burden is on the defendant to make a "strong showing of prejudice," *United States v. Moya-Gomez*, 860 F.2d 706, 768 (7th Cir. 1988), which requires showing more than that conducting separate trials increases the defendant's chances of obtaining an acquittal, *United States v. Ervin*, 540 F.3d 623, 629 (7th Cir. 2008). The defendant "must rebut the dual presumptions that a jury will (1) capably sort through the evidence and (2) follow limiting instructions from the court to consider each [count] separately." *United States v. Stillo*, 57 F.3d 553, 557 (7th Cir. 1995).

Burks argues that joinder of all four counts will prejudice him because of the risk that a jury "will conclude that Burks has a criminal disposition and will 'aggregate the evidence against him' or 'lessen the presumption of innocence.'" (ECF No. 18 at 7-8 (quoting 1A Wright & Miller's Federal Practice and Procedure § 223 (5th ed. 2024)).) He argues that, in a trial of Count One, evidence that he has a prior felony conviction and that he had drugs in his car a week later would be inadmissible. (ECF No. 18 at 8.) He also argues that "there is little to be gained from a joint trial in terms of judicial

efficiency" because there is one piece of evidentiary overlap—the revolver found in Burks's car. (*Id.* at 9.)

As the government points out, the following evidence would likely be admissible at both a trial of Count One and a trial of Counts Two through Four: testimony of at least one police officer about the arrest of Burks in his Tahoe and the recovery of the revolver; that Burks's DNA was on the revolver; that Burks made a *Mirandized* statement that he was the sole driver of the Tahoe, where the revolver was recovered; and officer testimony about the recovery of Burks's cellphone, downloading the phone, and key evidence therein relevant to both trials (i.e., photos of firearms including the revolver and Draco, photos of S.T.'s Mazda and paperwork). (ECF No. 28 at 36-37.) Furthermore, a jury in a trial on Count One likely *would* hear about the drugs in Burks's car as it is corroborative of A.H.'s statements, a key issue. Both trials would also likely include A.H.'s statement providing details about Burks (for Count One, to corroborate A.H.; for Counts Two through Four, to explain police conduct and as evidence in support of the "with intent" charge).

The significant evidentiary overlap weighs heavily in favor of a joint trial, and most of this evidence would be admissible in separate trials, creating minimal risk of prejudice. Burks has failed to rebut the presumption that a jury will capably sort through the evidence and follow limiting instructions from the court to consider each count separately.

Accordingly, the Court will order that Burks's motion to sever be denied.

### 3.5. Motion to Dismiss Count Two (ECF No. 19)

Burks argues that Count Two, charging him with unlawful possession of firearms in violation of 18 U.S.C. Sections 922(g)(1) and 924(a)(8), should be dismissed as an unconstitutional infringement on his Second Amendment right to keep and bear arms. (ECF No. 19 at 1.) He argues that § 922(g)(1) is unconstitutional facially and as applied to him because he has successfully discharged his prior sentences. (ECF No. 19 at 8-9.)

As the judges of this court have explained, prohibiting persons convicted of any felony from ever being able to possess a firearm is consistent with the history and tradition of the Second Amendment. *United States v. Neal*, No. 23-CR-141, 2024 U.S. Dist. LEXIS 75356, at *9 (E.D. Wis. Apr. 25, 2024) (Ludwig, J.); *United States v. Davis*, No. 22-CR-210, 2024 U.S. Dist. LEXIS 22134 (E.D. Wis. Feb. 8, 2024) (Stadtmueller, J.); *United States v. Johnson*, 701 F. Supp. 3d 785 (E.D. Wis. 2023) (Adelman, J.); *United States v. Watson*, No. 23-CR-109, 2023 U.S. Dist. LEXIS 182631 (E.D. Wis. Oct. 11, 2023) (Griesbach, J.); *see also United States v. Contreras*, No. 23-CR-185, 2024 U.S. Dist. LEXIS 59247, at *18 (E.D. Wis. Apr. 1, 2024) (Duffin, M.J.); *United States v. Neal*, No. 23-CR-141, 2023 U.S. Dist. LEXIS 237450 (E.D. Wis. Oct. 17, 2023) (Duffin, M.J.); *United States v. Denruyter*, No. 23-CR-155, 2023 U.S. Dist. LEXIS 209398 (E.D. Wis. Oct. 17, 2023) (Joseph, M.J.); *United States v. Washington*, No. 23-CR-35, 2023 U.S. Dist. LEXIS 235498 (E.D. Wis.

Sep. 15, 2023) (Joseph, M.J.); *United States v. Davis*, Case No. 22-CR-189, ECF No. 31 (E.D. Wis. Feb. 27, 2023) (Dries, M.J.); *cf. N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 22 (2022).

Even if the Court were to conclude it could assess a felon's dangerousness on a case-by-case basis in as applied challenges, it would not benefit Burks, whose felonies consist of fleeing, possession of cocaine, trafficking heroin, conspiring to deal firearms without a license, conspiring to receive, possess, and sell stolen firearms, and conspiring to possess with intent to distribute heroin. (ECF No. 28 at 47.) Nor are the convictions remote in time; Burks completed his supervision for his last conviction less than five months before his alleged conduct in this case. *Id.*

The statute is neither facially unconstitutional nor unconstitutional as applied to Burks, and the Court will recommend that the motion to dismiss be denied.

**4. Conclusion**

For the reasons set forth above …

**IT IS THEREFORE RECOMMENDED** that the defendant's motion to suppress evidence derivative of his arrest (ECF No. 21) be **denied**.

**IT IS THEREFORE ORDERED** that the defendant's request for a *Franks* hearing is **denied**.

**IT IS FURTHER RECOMMENDED** that the defendant's motion to suppress evidence derivative of the search warrants (ECF No. 20) be **denied**.

**IT IS FURTHER ORDERED** that the defendant's motion to sever (ECF No. 18) is **denied.**

**IT IS FURTHER RECOMMENDED** that the defendant's motion to dismiss Count Two (ECF No. 19) be **denied**.

**IT IS FURTHER ORDERED** that, in accordance with 28 U.S.C. § 636(b)(1)(B) and (C) and Fed. R. Crim. P. 59(b)(2), any written objection to any recommendation herein or part thereof shall be filed within fourteen days of service of this recommendation or prior to the Final Pretrial Conference, whichever is earlier. Failure to timely object waives a party's right to review.

Dated at Milwaukee, Wisconsin this 10th day of June, 2025.

WILLIAM E. DUFFIN
U.S. Magistrate Judge